## DOLLY CARTER v. THE STATE.

### No. 2781.   Decided February 1.

1. **Murder—Assault to Murder—Intent—Charge of the Court.**—The specific intent to *kill*, although not necessarily an essential element of murder—inasmuch as the intent to do serious bodily injury that may result in the death of the party killed may suffice—is indispensable, and must be proved, to constitute assault with intent to murder. Intent to do serious bodily harm is not sufficient. Under the proof in this case the jury should have been given the discretion to convict of a lower grade of assault than assault to murder if they believed the evidence did not show a specific intent to kill. See the opinion for instructions *held* erroneous, inasmuch as their effect was to restrict a verdict of guilty to the higher grade of assault, although they might have believed the proof did not show the specific intent to kill.

2. **Same—Self-Defense.**—The court charged the jury as follows: "If the defendant sought and brought on a conflict with John Mouchett, then he can not avail himself of the law of self-defense, though in such conflict his life or person was endangered." *Held*, insufficient under the evidence adduced. The said charge should have been qualified by the further instruction that if the defendant provoked the contest, but without any intention to kill or inflict serious bodily injury, he would not be wholly deprived of the right of self-defense.

APPEAL from the District Court of Hamilton. Tried below before Hon. C. K. Bell.

The conviction was for assault with intent to murder one John Mouchett, and the penalty assessed by the verdict was a term of two years in the penitentiary.

The record contains a voluminous statement of the facts proved on the trial, but for the purpose of elucidating the rulings on this appeal it is sufficient to set out the substance of the narratives of the prosecuting witness, for the State, and of the defendant (who was corroborated by other witnesses) in his own behalf.

John Mouchett testified, in substance, that he was in the employ of H. J. Carter, the father of the defendant, at the time of the alleged assault.    He and Northcutt, another hired hand, occupied a room in the "old" house in an orchard, which was separated from the "new" house by a partition fence.    Mr. H. J. Carter and his family, consisting of his wife and his sons, the defendant, George, and Bank Carter, and Nancy Connell, the sister-in-law of George Carter, occupied the new house.    After supper on the night of May 7, 1889, the defendant came to the witness's room door, and in a pleasant manner told the witness to go with him to the barn to help him catch chickens and put them in a coop.    Witness replied that he was suffering with a severe headache and would like to be excused.    Defendant left, and witness pulled off his shirt and proceeded to apply an ointment to his person to relieve the itch, with which he was afflicted.    A few minutes later, while witness was engaged in anointing himself, the defendant returned, pushed open the witness's door, and in a furiously angry voice ordered witness to go with him to catch chickens. He said to witness, "Come on, God damn you!  You have got to go, you God damned son-of-a-bitch!"    Witness replied that as soon as he could get on his shirt he would go to defendant's father and ask if he was expected to submit to such abuse from defendant.    Defendant replied that he would go with witness, and stepped into the hall.    The witness then closed the door, propped it with a wood-bottomed chair, and put on his shirt.    Defendant meanwhile stood in the hall cursing the witness.    After getting his clothes on, the witness secured his pistol and put it into the right hand pocket of his pants.    About that time defendant pushed open the door, seized the chair, raised it above the witness's head in a striking attitude, and ordered witness to go on.    Witness, followed by the defendant with the chair in a striking attitude, went to the new house and inquired for H. J. Carter, whom he was told was at the barn.    The witness, still followed by defendant, started to the barn.    En route they met H. J. Carter, and witness said to him, "Mr. Carter, please make Dolly let me alone."    Defendant said something about the witness insulting his mother, whereupon H. J. Carter said to the defendant, "Go for him!" Accordingly the defendant "went" for the witness, striking him over the head continuously with the chair.    Witness, with his right hand in his pocket on his pistol, and using his left arm in an effort to ward off the

blows, retreated until he had gained and passed the corner of the new house, and crossed the path leading from the new to the old house, when, believing he saw death at the hands of defendant staring him in the face, he pulled his pistol and fired in the direction of defendant, without, however, any intention of shooting defendant. With the chair the defendant knocked the pistol out of the witness's hand. The scuffle for the pistol resulted in the defendant getting possession of it, and witness fled into the orchard, jumping the fence and tearing off a paling, which he took with him. Defendant, with the pistol, old man Carter, and George Carter, who meanwhile had joined the party, pursued the witness, cursing him. When they had nearly overtaken witness, George Carter threw a stone, which struck witness on the jaw and broke it in two places. Witness fled a few steps further and then stopped, turned, and retraced his steps until he met defendant and George Carter, when he and they stopped. Witness told them that he could strike them with the paling, but that he would not do so if they let him alone. They made no further effort to strike witness, but old man Carter, who came up about that time, sprang on the witness, bore him to the ground, and with one hand choked him almost to suffocation. After a few minutes witness was released and taken back to the house. Later in the night he left the house and went to the town of Hamilton.

The defendant testified in his own behalf, in substance, that at the supper table on the night preceding the alleged assault, Mouchett being present, H. J. Carter said that he wanted the boys (meaning witness, Mouchett, and the others) to catch and coop chickens after supper, to keep them off the crops. All of the boys except Mouchett obeyed the direction. The same direction was given by H. J. Carter on the next night, Mouchett being present. Mouchett finished his supper and went to his room. When witness got through with his supper he went to Mouchett's room, and asked him to go to the barn and help catch and coop chickens. Mouchett replied that he had a headache. Witness told him that the exercise would cure it, and left. About twenty minutes later witness returned to the hall of the old house, which was used as the dining room, for a drink of water. He found his mother and Nannie Connell washing the dishes. His mother then told him that after he and the others went to the barn she went to the door of Mouchett's room and asked him why he did not go; that Mouchett replied sullenly that he was not asked to catch chickens; that she replied to him, "Yes, John, Mr. Carter asked you the same as he did the other boys;" that Mouchett replied in an angry manner, "It is no such a thing—I was not asked." Witness asked his mother, "Did he talk to you like that?" She replied that he did. Witness at once stepped to Mouchett's door and pushed it open. He was met by Mouchett with a pistol presented in a shooting attitude. Witness said to him, "No gentleman will talk to a woman as

you have done. You can sauce me, but you must not sauce my mother." Mouchett then put his pistol into the right hand pocket of his pants, and said that he would go and see witness's father. Witness replied that he would go with him. They went to the new house, but failed to find old man Carter, and then started to the barn. When they reached the porch Mouchett said that he would go no farther, put his right hand into his pants pocket, and with his other pushed witness backwards. Witness seized a convenient light cane-bottomed chair, raised it up, and told him that he must go. They again started to the barn in quest of old man Carter. At the yard gate they met George Carter, who passed into the yard. About that time old man Carter came up and asked what was the matter. Witness told him what Mouchett had said to his mother, and old man Carter asked him, "Why didn't you knock him down?" Witness and Mouchett then passed around the corner of the house to the path leading from the new to the old house, when the witness put the chair down. Mouchett grabbed at the chair, but witness secured it. Mouchett at once presented his pistol at witness's head and fired, the ball passing within a few inches of witness's ear. Immediately the witness struck him on the head with the chair and knocked him down. As he got up George caught him from behind, and witness struck again, nearly knocking both George and Mouchett down. About that time old man Carter came up and asked who fired the shot. Mouchett replied that he did not. Witness replied, "You know that you did." Mouchett then admitted that the shot was fired by him, but claimed that it was an accident. Old man Carter then said that he would allow no man to carry a pistol on his place, and that he would take Mouchett to Hamilton and turn him over to the authorities for carrying the pistol. Mouchett then fled, jumped the fence into the orchard, tearing off a paling, which he kept in his hands. Old man Carter then told witness and George to pursue and capture Mouchett, as he intended to take him to Hamilton on the charge of carrying concealed weapons. When witness overtook Mouchett he rushed upon witness to strike him with the paling, but the paling caught in a peach tree, when witness knocked him down with his fist. Mouchett got up and attempted to strike with the paling, but was again knocked down by witness. He got up just as George arrived, and proposed to "quit" if witness and George would. About that time old man Carter arrived. He seized Mouchett and ordered him to surrender the pistol. Mouchett replied that he had lost it. Mouchett was then taken back to his room, where his wounds were washed and dressed by Northcut and George Carter. The pistol was found on the ground where witness struck Mouchett with the chair. Bank Carter afterwards came to the room and asked for a private conversation with Mouchett. Everybody retired from the room except Bank and Mouchett, and witness did not see Mouchett again until he saw him in the town of Hamilton.

*J. A. Eidson,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WILLSON, JUDGE.—Several objections are urged by counsel for defendant to the charge of the court, some of which, in our opinion, are well founded. In the main, however, the charge is an exhaustive and able presentation of the law of the case.

The second and third errors assigned are as follows:

"2. The court erred in the following paragraph of its charge, to-wit: 'If you believe from the evidence that the defendant, in the county and State, and at or about the time alleged in the indictment, made an assault and battery upon John Mouchett, and that he was not justifiable in so doing under any of the instructions which will be hereinafter given you, and if the evidence fails to show that such assault was made with the specific intention on the part of the defendant of taking the life of the said John Mouchett thereby, and that if the death of the said John Mouchett had resulted therefrom, the defendant would have been guilty of murder; and if you further believe from the evidence that by such assault and battery a serious bodily injury was inflicted upon the said John Mouchett, you will find the defendant guilty of aggravated assault and battery, and assess his punishment as herein directed for that offense;' because said paragraph requires that the evidence fail to show both the specific intent to kill and that if death had ensued from such assault and battery it would have been murder, before such offense would have been reduced to aggravated assault, whereas the failure to show either would have been sufficient.

"3. The court erred in the following paragraph of its charge, to-wit: 'Again, if you believe from the evidence that in the county and State, and at or about the time alleged in the indictment, some person or persons other than defendant made an assault and battery upon John Mouchett, and if the evidence fails to show that such assault and battery was made with the intention on the part of such person or persons of taking the life of the said John Mouchett thereby, and that if the death of the said John Mouchett had resulted therefrom, such person or persons would have been guilty of murder, as that offense has been hereinbefore explained to you,' etc.; because said paragraph requires that the evidence fail to show both a specific intent to kill and that the act would be murder if death had ensued, before the offense would be reduced to aggravated assault, whereas the failure to show either would be sufficient."

For the reason stated in the assignments we think said paragraphs of the charge are erroneous, and materially so, because calculated to prejudice the rights of the defendant. Under the facts of the case, the jury might have believed that the assault, if it had resulted in death, would

have been murder, and yet may have believed that the evidence did not show a specific intent to kill the assaulted party, but although so believing, they could not convict under the charge of an aggravated assault. Murder may be committed although a specific intent to kill the deceased does not exist in the mind of the slayer. If the intent be to inflict upon the person killed serious bodily injury, which may cause his death, the homicide may be murder, although a specific intent to kill may not be shown. Willson's Crim. Stats., secs. 1039, 1041. But to constitute the offense of an assault with intent to murder there must be a specific intent to kill. An intent to do serious bodily harm is not sufficient, and if the jury believed in this case that the evidence did not show a specific intent to kill, whatever else they might believe, they could not convict the defendant of that offense, but might have convicted him of a lower grade of assault, and should have been, by the charge, given the discretion of doing so. Willson's Crim. Stats., sec. 857.

The fifth assignment of error is as follows: " The court erred in giving the following charge to the jury, to-wit, 'If the defendant sought and brought on a conflict with John Mouchett, then he can not avail himself of the law of self-defense, although in such conflict his life or person was endangered,' without also instructing them as to the law of partial or imperfect self-defense, and without also instructing the jury as to what offense the defendant would be guilty of in the event it appeared from the evidence that the defendant had sought and brought on a conflict with the said Mouchett merely for the purpose of committing a battery upon him, and not with the intention of killing him."

This assignment must also be held well founded. If the defendant provoked the contest, but without any intention to kill or inflict serious bodily injury, he would not be wholly deprived of the right of self-defense. He might still have an imperfect right of self-defense, which, although not sufficient to justify his act, might reduce the grade of it. Willson's Crim. Stats., sec. 981. We think the evidence required that the instruction given by the court as to defendant's provoking the difficulty should have been qualified as above indicated, and that the failure to qualify it was material error.

In other respects than those we have mentioned, we think the charge of the court is unobjectionable, and that there was no error in refusing the special requested instructions.

Because of the errors in the charge which we have discussed, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Hurt, J., absent.